UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DONALD ROSE, et al.,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>TRENT RHORER, et al.,<br><br>　　　　Defendants. | Case No. 13-cv-03502-WHO<br><br>**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND FOR JUDGMENT ON THE PLEADINGS; SEALING RECORDS**<br><br>Re: Dkt. No. 114 |

## INTRODUCTION

The pervasiveness and intractability of homelessness remains a blight on the City and County of San Francisco and a scourge for its victims. The most recent count identified 6,436 homeless men and women within the City limits.[1] 63% report severe mental illness or chronic physical illness. 59% are unsheltered each night. 17% are under the age of 25. 11% are veterans. To consider only one effect of homelessness: it reduces one's life expectancy by 25 years.

Four homeless disabled men filed suit against the City and County of San Francisco and various officials on July 30, 2013, asserting that the City's reservation system for emergency shelter violated the Americans with Disabilities Act. The City funds the operation of eight homeless shelters to provide at least 1,126 beds each night. This program, one of several ways the City addresses homelessness, does not differentiate between those who are disabled and those who are not: instead, the beds are offered for 90 days as a transitional housing opportunity on a first come, first served basis. The system in effect when the suit was filed, which was then in the

---

[1] The statistics in this paragraph are taken from the 2013 San Francisco Homeless Point-in-Time Count & Survey Comprehensive Report, at pages 11, 16, 27, 35, attached as Exhibit A to the Declaration of Scott Walton in Support of Defendants' Motion for Summary Judgment [Dkt. No. 116-1].

process of being changed and now has been changed, allegedly required the disabled homeless to line up in front of homeless resource centers to secure a bed in competition with the able-bodied homeless, with some accommodation for the disabled on a case-by-case basis for those who sought help. The new system is much less likely to burden the disabled homeless, who can now access the system by telephone instead of competing with the able-bodied in line.

The plaintiffs, current and former clients of San Francisco's homeless shelters, identified a number of issues regarding the shelters. While the problems of homelessness demand the attention of all of us, there are a variety of reasons why the plaintiffs' legal claims cannot succeed and why I will GRANT the defendants' motion for summary judgment. The reservation system challenged by the plaintiffs is no longer in use. What the plaintiffs seek would fundamentally alter the nature of San Francisco's shelter system, requiring that the available beds be prioritized for a portion of the disabled homeless population for the long term, rather than provide transitional shelter for anyone who is homeless on an equal basis—the ADA does not require the City to make such a change. The plaintiffs undoubtedly face difficult problems but they are not of the City's making—the plaintiffs have not presented evidence from which a jury could reasonably conclude that they were discriminated against because of their disabilities or that they were ever denied a reservation because of their disability. Moreover, the plaintiffs' claims are barred by an earlier settlement of a class action lawsuit regarding San Francisco's homeless shelters.

**BACKGROUND**

San Francisco, through its Human Services Agency, funds the operation of at least 1,126 emergency adult shelter beds for the homeless through contracts with several non-profit providers. Walton Decl. ¶ 30 [Dkt. No. 116]. The emergency adult shelter system is intended to provide short-term support for homeless adults so that they can obtain a permanent housing placement; it is not intended to provide long-term housing for homeless adults. *Id.* ¶ 3. 90 days is the standard length for a reservation, but a shelter client can seek one automatic 30-day extension upon request at the shelter. *Id.* ¶ 11.

*Pro se* plaintiffs Donald Rose, Larry Richards, Elley Fore III, and Raj K. Judge filed a complaint and motion for preliminary injunction in July 2013, alleging that San Francisco's

method for assigning 90-day bed reservations within the single adult emergency shelter system to homeless people in need of such beds discriminates against them on the basis of their disability.[2] They contended that the only way to obtain bed reservations is to wait overnight in a line at a homeless resource center, that they cannot obtain a bed in this manner, and that this reservation system violates the ADA Act. *See, e.g.,* Dkt. No. 1 at 6-7. The plaintiffs sought various changes to the shelter system, including automatic shelter extensions, transformation of shelter beds into medical respite beds, and dedicated shelters for people with disabilities. *See, e.g.,* Dkt. No. 88 (alleging that telephone reservation system is "inherently discriminatory if there is no disabled only shelter system established").

The plaintiffs filed an amended motion for a temporary restraining order on August 5, 2013. Dkt. No. 41. On August 9, 2013, I held a preliminary hearing on the motion for a temporary restraining order. Dkt. No. 46. At the hearing, San Francisco agreed to preserve the status quo by continuing to make disabled access beds available to Messrs. Richards and Rose until the parties briefed and I addressed the merits of the motion for a temporary restraining order. Mr. Fore indicated that he was not then residing at the shelter, but San Francisco agreed to investigate whether provisions could be made to provide Mr. Fore with shelter accommodation.

Despite requesting, and receiving, two requests to continue the hearing on their motion for a temporary restraining order, the plaintiffs never responded to San Francisco's opposition to the motion. On October 31, 2013, I denied the plaintiffs' motion for a preliminary injunction,[3] finding that the plaintiffs had not met their burden to show that it was likely that they would prevail on the

---

[2] The complaint also names the Survivors of James Larson and an "Unknown man injured but Defendants are withholding His name" as plaintiffs. These purported plaintiffs have not appeared in this action, either *pro se* or through counsel, and are not bound by this order.

[3] By October 31, 2013, I treated the plaintiffs' motion as one seeking a preliminary injunction, given the amount of time that had elapsed.

3

merits or that they faced irreparable injury.[4]  Dkt. No. 77.

Following the filing of their initial complaint, the plaintiffs filed several miscellaneous pleadings reiterating various objections to the emergency shelter system.  *See*, *e.g.,* Dkt. Nos. 41, 57, 58, 64, 65, 69, 88.  The pleadings did not respond to San Francisco's arguments or otherwise address the deficiencies in the plaintiffs' complaint which formed the basis for the denial of their motion for a preliminary injunction.  On January 31, 2014, plaintiff Rose filed additional pleadings containing various allegations and objections to the shelter system.  Dkt. Nos. 93-96.  I treat these filings as Mr. Rose's amended complaint.

In February 2014, San Francisco implemented a new shelter reservation system which changed the method of reserving emergency shelter.  Walton Decl. ¶ 13.  Under the new system, there is a waitlist for people seeking 90-day bed reservations.  *Id*. ¶ 14.  Each day, everyone who sought but failed to obtain a 90-day bed the previous day is added to the waitlist.[5]  Each day, 90-day beds are awarded to the people at the top of the waitlist, and when a person reaches the top of the waitlist, that person has 10 days to claim an available 90-day bed.  *Id.* ¶ 15.  In addition, San Francisco now permits people to make 90-day bed reservations by calling a 311 telephone information system.  *Id*. ¶ 17.  People who need the assistance of reservation station workers can still make reservations at the homeless resource centers and other reservation stations throughout the city.  *Id.* ¶ 18.

San Francisco moved for summary judgment on March 4, 2014.  Dkt. No. 114.  The plaintiffs did not oppose it timely in writing.  At oral argument on April 9, 2014, Mr. Rose stated

---

[4] I granted the plaintiffs leave to file an amended complaint by December 31, 2013.  I later extended that deadline until January 31, 2014, upon the plaintiffs' request.  Dkt. No. 92.  On February 11, 2014, I denied the plaintiffs' request for a further extension, noting that "the plaintiffs have filed several lengthy briefs with the Court, but have not filed an amended complaint or otherwise addressed the deficiencies in the claims asserted in the underlying complaint, which formed the basis for the denial of their motion for a temporary restraining order.  In short, the plaintiffs have demonstrated an ability to draft lengthy pleadings and file them with the Court, but chose not to file an amended complaint."  Dkt. No. 101 at 2-3.

[5] The waitlist gives priority to people who have been waiting for shelter the longest and do not have a current 90-day bed.  The order of names within each day is random.  *Id*. ¶ 14.

1 that he had additional documents which he had been unable to file ahead of the hearing. He filed
2 those documents the following day. Dkt. Nos. 124-127. I have reviewed those filings in detail
3 and address them below.

**LEGAL STANDARD**

5 Summary judgment is proper "if the movant shows that there is no genuine dispute as to
6 any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).
7 The moving party bears the initial burden of demonstrating the absence of a genuine issue of
8 material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party, however, has
9 no burden to disprove matters on which the non-moving party will have the burden of proof at
10 trial. The moving party need only demonstrate to the court "that there is an absence of evidence to
11 support the nonmoving party's case." *Id.* at 325.

12 Once the moving party has met its burden, the burden shifts to the non-moving party to
13 "designate specific facts showing a genuine issue for trial." *Id.* at 324 (quotation marks omitted).
14 To carry this burden, the non-moving party must "do more than simply show that there is some
15 metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
16 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient;
17 there must be evidence on which the jury could reasonably find for the [non-moving party]."
18 *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

19 In deciding a summary judgment motion, the court must view the evidence in the light
20 most favorable to the non-moving party and draw all justifiable inferences in its favor. *Id.* at 255.
21 "Credibility determinations, the weighing of the evidence, and the drawing of legitimate
22 inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for
23 summary judgment." *Id.* However, conclusory or speculative testimony in affidavits is
24 insufficient to raise genuine issues of fact and defeat summary judgment. *See Thornhill Publ'g
25 Co. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

**DISCUSSION**

27 For the reasons stated below, the plaintiffs are not entitled to injunctive relief or damages.
28 San Francisco's motion for summary judgment is GRANTED.

## I. INJUNCTIVE RELIEF IS NOT AVAILABLE

### A. San Francisco has changed the challenged activity

As noted above, the reservation system challenged by the plaintiffs is no longer in use. Reservations can now be made over the phone with the 311 reservation system. In addition, under the new system, requests are added to the waiting list in random order, meaning a person who makes a reservation in the evening has the same odds of being added to the top of the waiting list as a person who makes a reservation early in the morning. As a consequence, the system that the plaintiffs challenged—which allegedly discriminated against them because they had to compete with non-disabled persons to be first in line early in the morning when the resource centers open— is no longer in effect. As the challenged system has been replaced by a system that does not include the challenged features, the plaintiffs' complaint is moot.

### B. Plaintiffs' proposed relief would improperly fundamentally alter San Francisco's emergency adult shelter system.

The ADA does not require public entities to fundamentally alter the nature of the service they provide in order to accommodate people with disabilities. *Tennessee v. Lane*, 541 U.S. 509, 532 (2004). An alteration is fundamental if it would alter "the essential nature" of the program. *See, e.g., Alexander v. Choate*, 469 U.S. 287, 300 (1985). For example, "public entities are not required to create new programs that provide heretofore unprovided services to assist disabled persons." *Townsend v. Quasim*, 328 F.3d 511, 518 (9th Cir. 2003).

In this case, the plaintiffs have requested automatic shelter extensions, transformation of shelter beds into medical respite beds, and dedicated shelters for people with disabilities. These requests would fundamentally alter San Francisco's emergency adult shelter program, transforming it into long-term housing for a small group of people with disabilities, and are therefore not required by the ADA.

## II. PLAINTIFFS CANNOT OBTAIN DAMAGES

### A. Plaintiffs' claims are barred by the *WRAP v. Newsom* class settlement

Plaintiffs are members of a class that brought and settled claims against San Francisco concerning the shelter reservation system in *Western Regional Advocacy Project v. Newsom*, Case No. 08-cv-4087 MMC (N.D. Cal.) ("*WRAP*"). The *WRAP* plaintiffs alleged that San Francisco's

emergency adult shelter system discriminated against people with disabilities by separating the resource centers and reservation stations from the shelters themselves, forcing disabled people to line up to obtain a bed, sometimes overnight, and making it difficult or impossible for them to obtain shelter reservations. Ex. A to Van Aken Decl., ¶¶ 9, 81-86, 90, 93. For example, the *WRAP* plaintiffs alleged that:

> In order to get a reservation for a single night, a homeless person must line up and wait for many hours early in the morning- and, if she is unable to get a bed assigned, again late in the evening- at resource centers that are separate from the shelters themselves and have changing locations and inconsistent hours. *Many persons with disabilities, because of their disability, are unable to comply with the requirements to obtain a shelter bed.*

*Id*. ¶ 9 (emphasis added).

The *WRAP* complaint also alleged disability discrimination by forcing disabled homeless people to transport themselves from a resource center to the shelter itself. *Id.* ¶¶ 94-97.

The class in the *WRAP* lawsuit was defined as:

> [A]ll persons in San Francisco with disabilities as defined under the Americans with Disabilities Act, 42 U.S.C. §§ 12101 et seq.; . . . , who have sought access to the San Francisco single adult emergency shelter system for homeless persons, or who may seek access to the San Francisco single adult emergency shelter system for homeless persons during the Term of Agreement[6] . . . .

Members of the settlement class released all claims against San Francisco:

> to the extent that such claims arise out of or are related to the transactions, occurrences, acts or omissions that Plaintiffs have alleged in the Action, as well as such claims based on conduct that occurs during the Term of Agreement to the extent that such claims arise out of or are related to transactions, occurrences, acts or omissions that Plaintiffs have alleged in the Action and in compliance with the terms of this Settlement Agreement

Van Aken Decl., Ex. B at I.2 (*WRAP* settlement agreement).

The plaintiffs allege that they are persons with disabilities who have sought access to San Francisco's single adult emergency shelter system. Accordingly, they are members of the *WRAP*

---

[6] The WRAP release extends for the duration of the settlement agreement. The settlement agreement endures until San Francisco's contracts with the shelters expire.

class. In addition, the plaintiffs' allegations "arise out of or are related to the transactions, occurrences, acts or omissions" alleged in the *WRAP* complaint because both actions allege that San Francisco's shelter reservation system discriminates against the disabled by requiring the disabled to wait in line at the resource centers in order to make a bed reservation. For that reason, the plaintiffs, as members of the *WRAP* class, previously released the claims at issue here.

In his submission after the hearing, Mr. Rose argues that *WRAP* "covered other realities; and is not relevant to the realities of 2014." Dkt. No. 125 at 2. But the *WRAP* release was forward-looking, covering prospective claims occurring during the life of San Francisco's then-existing contracts with the homeless shelters. It is undisputed that those contracts are still in effect. Mr. Rose's claims are therefore covered by the *WRAP* agreement.[7]

### B. The plaintiffs cannot show that San Francisco acted with discriminatory intent or deliberate indifference

Compensatory damages are available under Title II only if the plaintiff shows that a public entity acted with "discriminatory intent" or "deliberate indifference." *Lovell, v. Chandler*, 303 F.3d 1039, 1056 (9th Cir. 2002) (internal citations and quotation marks omitted); *Duvall v. County of Kitsap*, 260 F.3d 1124, 1138-39 (9th Cir. 2001). There is no evidence that San Francisco had notice of any request for reasonable accommodation by any of the plaintiffs and denied it with "discriminatory intent" or "deliberate indifference." As noted above, Mr. Richards's and Mr. Rose's requests for automatic extensions of their shelter stays are not reasonable accommodations because they would fundamentally alter the nature of the San Francisco's emergency shelter system.

Mr. Richards does not allege any incident where he was denied access to shelter because of his disability. There is also no allegation that he sought an accommodation to use the reservation process and was refused. Mr. Rose alleges that he was ejected from shelter in May 2013 for ten hours because of his disability. Dkt. 1 at 12:9-15. But neither the complaint nor Mr. Rose's miscellaneous filings explain the circumstances of this ejection or how it relates to Mr. Rose's

---

[7] Mr. Rose also challenged a separate City program, Care Not Cash. His argument is addressed later in this Order.

1  disability. Mr. Rose offers no evidence to show disability discrimination in connection with this
2  incident. Mr. Judge and Mr. Fore likewise do not allege or provide evidence that they sought an
3  accommodation on the basis of their disability and were denied accommodation.

### III. OTHER CLAIMS

#### A. Retaliation for protected speech or for exercise of associational rights in violation of the First Amendment

There is no evidence that San Francisco has intentionally retaliated against the plaintiffs' exercise of speech or associational rights. The shelter-bed reservation procedures that the plaintiffs object to—that reservations are not automatically extended and that reservations are obtained in person at a reservation station—are standard for all shelter-seekers and not special hardships imposed on the plaintiffs in retaliation for protected activity.

#### B. Violation of the plaintiffs' equal protection rights

People with disabilities are not a specially protected class for purposes of equal protection law. *Pierce v. Cnty. of Orange*, 526 F.3d 1190, 1225 (9th Cir. 2008). Therefore, "a governmental policy that purposefully treats the disabled differently from the non-disabled need only be rationally related to legitimate legislative goals to pass constitutional muster." *Id.* The equal protection claim fails because the plaintiffs do not allege that people with disabilities are treated differently than other homeless people in the shelter system, and they identify no similarly situated person without a disability who was treated differently than they were treated. On the contrary, the plaintiffs complain that they were treated the same as people without disabilities.

### IV. MR. ROSE'S NEW CLAIMS

#### A. Request for sanctions

Mr. Rose seeks $1 million in sanctions against San Francisco for filing records from San Francisco's CHANGES database of adult emergency shelter bed use concerning Mr. Rose's history of using the shelter system. *See* Dkt. 95 at 2-3; Dkt. No. 126. The records at issue were submitted in connection with San Francisco's opposition to the plaintiffs' motion for a preliminary injunction. Dkt. 54-5 (Mr. Rose's reservation records). Mr. Rose contends that the records are inaccurate, defamatory, and not relevant.

1  Mr. Rose's motion for sanctions is DENIED. San Francisco's filing of the records was not improper and is not sanctionable. Mr. Rose sued San Francisco, alleging that San Francisco's shelter system discriminated against him on the basis of his disability. Mr. Rose's ability to use that shelter system, which is demonstrated in the records, is relevant to those claims. Mr. Rose offers no support for his allegation that the records were "fabricated" by the City Attorney. Scott Walton, the Manager of Adult Housing and Homeless Programs for the San Francisco Human Services Agency, stated in his declaration that the records are a "true and correct copy of printouts from the CHANGES database showing Mr. Rose's use of the single adult emergency shelter system for the calendar years 2010 through 2013." Walton Decl. ¶ 22.

Even assuming the records are inaccurate, San Francisco's filing of records is not sanctionable because there is no evidence suggesting that San Francisco was aware that the records were fabricated or that San Francisco filed the records for an improper purpose. The records filed by San Francisco do not contain any information protected by statute or court rule, such as Mr. Rose's date of birth or social security number; they merely state the dates that Mr. Rose used the shelter and include a field for "Client Notes," with notes such as "Completed," "Late Pass," and "No Show." Mr. Rose's own complaint already disclosed publicly that Mr. Rose has used the shelter.

Mr. Rose contends that the records are defamatory because he is "in the process of receiving close to one million dollars from an investor to start an art publishing company" and he does not want his "good name publically slandered by false and misleading data." Dkt. No. 126 at 3. While I do not agree that San Francisco's conduct was defamatory, Mr. Rose has presented sufficient cause to seal the records from public access. Accordingly, I order Mr. Rose's records at Docket Number 54-5 SEALED.

**B. "Statement of Claims" Count 1**

In Count 1 of his Statement of Claims, Mr. Rose alleges that San Francisco may have decreased the number of available adult shelter beds since 2010. Dkt. No. 96 at 2. This may be an allegation that San Francisco has breached the *WRAP* settlement agreement. *See* Dkt. No. 96 at 2 ("These beds should be restored if the count has decreased."). If true, this claim must be resolved

through the meet and confer process described in the *WRAP* settlement agreement, with disputes ultimately subject to resolution by Judge Chesney, who entered the *WRAP* settlement.[8] If this is not an allegation that San Francisco has breached the *WRAP* settlement, then the claim is dismissed because Mr. Rose has not stated why it violates any state or federal law for San Francisco to decrease the number of shelter beds within the adult emergency shelter system.

### C. "Statement of Claims" Counts 2 through 8

Mr. Rose's Counts 2 through 8 in his Statement of Claims and his post-hearing declaration request various changes to the shelter system, including increasing the number of shelter beds; creating a separate shelter for people over age 55; and providing specified services at shelters like wi-fi, meals, medical care, supplemental storage, and other services. *See, e.g.,* Dkt. 96 at 2-5; Dkt. No. 125 at 2 ("The current 1230 beds need to be extended minimally to 1930 beds or 50%."). Mr. Rose also asserts, without explanation or any factual allegations in support, that "Care Not Cash[9] is unconstitutional and an act of organized crime" (Dkt. No. 125 at 5) and requests federal review of the "Care Not Cash" program. Dkt. No. 93.

Mr. Rose lacks standing to raise these claims because he does not allege that he has been injured by San Francisco's failure to provide these services and he does not state what legally protected interest has been harmed. Mr. Rose also fails to provide any state or federal law showing that he is entitled to these services.

### D. "Request for Review"

In a filing titled "Request for Review," Mr. Rose contends that limiting shelter reservations

---

[8] Mr. Walton states that the *WRAP* settlement requires San Francisco's Human Services Agency "to operate at least 1,126 adult emergency shelter sleeping spaces. HSA has operated at least that number of shelter beds since the settlement agreement was approved by the court." Walton Decl. ¶ 30.

[9] According to San Francisco, "Care Not Cash is a set of reforms, enacted in 2002, to the CAAP program. CAAP, in turn, is San Francisco's means of fulfilling its requirement, imposed by state law, to provide "relie[f] and support" for its indigent residents. *See* Cal. Welf. & Inst. Code § 17000. Under the Care Not Cash reforms, San Francisco switched from providing direct cash grants to indigent residents to providing a combination of cash grants and guaranteed in-kind services, including shelter and food.

to 90 days for the disabled, elderly, and severely medically impaired is "extremely cruel and in need of reform." Dkt. No. 94. Assuming that this is a claim under the ADA, it fails because it would require San Francisco to fundamentally alter its emergency shelter program, as discussed above.

## CONCLUSION

San Francisco's motion for summary judgment and judgment on the pleadings is GRANTED. The plaintiffs' complaint (Dkt. No. 1) is DISMISSED WITH PREJUDICE with respect to plaintiffs Donald Rose, Larry Richards, Elley Fore III, and Raj K. Judge. The complaint is DISMISSED WITHOUT PREJUDICE with respect to the plaintiffs identified in the original complaint who have not appeared in this litigation: the Survivors of James Larson and an "Unknown man injured but Defendants are withholding His name."

Mr. Rose's other claims (Dkt. Nos. 93-96, 124-127) are DISMISSED WITHOUT LEAVE TO AMEND as Mr. Rose has not presented any basis to believe that he can assert viable claims.

Mr. Rose's records at Docket Number 54-5 are ordered SEALED.

**IT IS SO ORDERED**.

Dated: May 9, 2014

_____
WILLIAM H. ORRICK
United States District Judge

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DONALD ROSE, et al,<br><br>    Plaintiffs,<br><br>  v.<br><br>TRENT RHORER, et al,<br><br>    Defendants. | Case Number: CV13-03502 WHO<br><br>**CERTIFICATE OF SERVICE** |

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on May 9, 2014, I SERVED true and correct copies of the attached, by placing said copies in postage paid envelopes addressed to the persons hereinafter listed, by depositing said envelopes in the U.S. Mail.

Donald Rose
1230 Market Street, Suite #228
San Francisco, CA 94102

Elley Fore
16 Capp Street
San Francisco, CA 94103

Larry Richards
The Next Door Homeless Shelter
1001 Polk Street
San Francisco, CA 94109

Dated: May 9, 2014

Richard W. Wieking, Clerk
By: Jean Davis, Deputy Clerk